UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NARTISHA BATES, | ) | CASE NO. 1:22-CV-2269 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS HEALTH | ) | **MEMORANDUM OPINION** |
| SYSTEM, INC., | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant University Hospitals Health System, Inc.'s ("UHHS" or

"Defendant") motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure.  (Doc. No. 17.)  Plaintiff Nartisha Bates ("Bates" or "Plaintiff") opposed the motion

only as to her Title VII race discrimination claims (Counts 5 and 6), Title VII retaliation claims

(Counts 7 and 8), and Family Medical Leave Act ("FMLA") retaliation claim (Count 10).  (Doc.

No. 21.)  UHHS timely replied in support of its motion.  (Doc. No. 24.)  For the reasons stated

herein, Defendant's motion for summary judgment is GRANTED.

## I.    BACKGROUND

### A.    Facts

In October 2018, UHHS hired Bates as a Revenue Cycle Supervisor in its Revenue

Cycle-Revenue Integrity Department.  (Doc. No. 21 at 261; Doc. No. 21-1 at 283, ¶ 1.)[1]

Plaintiff's responsibilities included "supervising the day to day operations of the assigned patient

accounts 'to ensure the productive and timely submission and resolution of insurance and/or

patient claims for all hospital and physician services.'"  (Doc. No. 21 at 261; Doc. No. 17-1 at

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document
and PageID# rather than any internal pagination.

214.)  Plaintiff supervised a team of twenty to twenty-five employees, which met weekly.  (*See* Doc. No. 21 at 261; *see also* Doc. No. 17-2 at 323, ¶ 7; Doc. No. 17 at 128.)  Plaintiff was also tasked with regularly completing audit reports for her subordinate employees as a means of assessing competency, identifying issues, and addressing any deficiencies through coaching or training.  (Doc. No. 17 at 129-30; Doc. No. 17-2 at 233, ¶ 11.)

In August 2019, Kelly Thomascik became Plaintiff's supervisor.  (Doc. No. 17 at 128; Doc. No. 17-2 at 231, ¶ 3.)  Unlike Plaintiff's previous supervisor, Thomascik attended and assisted Plaintiff with weekly team meetings.  (*See* Doc. No. 17 at 128.)  While attending these meetings, Thomascik "observed that Plaintiff was ineffective in running her weekly team meetings."  (Doc. No. 17-2 at 232, ¶ 7.)  Specifically, Thomascik noted Plaintiff was "confrontational with employees, favored African American employees, and was unwilling or unable to enforce Defendant's policies and requirements with respect to African American employees."  (*Id.*)  According to Thomascik, Plaintiff "would either delay reporting performance issues for African American employees or outright fail to report the issues at all."  (*Id.*)  Thomascik did not attend weekly meetings for other Revenue Cycle Supervisors.  (*Id.* ¶ 8.)  In April 2020, Thomascik positively reviewed Plaintiff's performance for the 2019 performance year.  (Doc. No. 22 at 325.)  Plaintiff was rated an effective contributor for both her job specific competencies and performance expectations.  (*Id.*)

In 2020, Plaintiff "began having issues" with certain employees on her team.  (Doc. No. 21 at 261; Doc. No. 21-1 at 283, ¶ 4.)  One employee, Ashley Djukic, submitted an anonymous complaint about Plaintiff.  (Doc. No. 17 at 129; Doc. No. 17-1 at 157.)  According to Plaintiff, Djukic was struggling with her workload and was exhibiting "insubordinate behavior."  (Doc. No. 21 at 261-62; Doc. No. 21-1 at 283, ¶ 4.)  In response, Plaintiff expressed her concerns to

Thomascik and sought permission to issue a disciplinary action against Djukic. (Doc. No. 21-1 at 283, ¶ 5.) Thomascik denied the request to pursue such an action. (*Id.*)

In August 2020, Plaintiff forwarded communications between Plaintiff, Djukic, and another biller, Laureese Shotwell, to Wesley Haymon, a human resources generalist. (Doc. No. 21 at 262; Doc. No. 22 at 342.) Plaintiff complained to Haymon that Thomascik "was showing a discriminatory racial bias or preference towards Djukic, based on her race[.]" (Doc. No. 21-1 at 283, ¶ 6.)

In October 2020, Plaintiff again requested to discipline Djukic for insubordination. (*See* Doc. No. 17-1 at 217-21.) According to Thomascik, Plaintiff sought to issue a final written warning to Djukic and refused to conduct weekly meetings due to Djukic's alleged conduct. (Doc. No. 17-2 at 232, ¶ 10.) Thomascik denied Plaintiff's proposed disciplinary measure, stating that she had "not observe[d] any behavior from Djukic that warranted any discipline, let alone a final written warning." (*Id.*) After Thomascik declined to discipline Djukic, Plaintiff again raised concerns of race discrimination while meeting with Thomascik. (Doc. No. 21 at 263; Doc. No. 21-1 at 284, ¶ 7.) Thomascik relayed Plaintiff's comments about race discrimination to her supervisor, Chelsea Pishnery, the Director of Revenue Integrity and Billing. (*See* Doc. No. 21-3 at 300.) On October 14, 2020, Pishnery contacted Haymon stating that she had "some concerns about how [Plaintiff] handled a meeting with [Thomascik]" and was further "concerned on how [Thomascik] was treated and how [Plaintiff] is continuing to treat certain members of her team." (Doc. No. 22 at 360-61.)

In October 2020, Haymon met with Thomascik and Pishnery regarding placing Plaintiff on a performance improvement plan ("PIP"). (Doc. No. 17-2 at 233, ¶ 14; Doc. No. 21-1 at 284, ¶ 9; Doc. No. 17-3 at 237-28, ¶¶ 4-5.) Together, Haymon, Thomascik and Pishnery decided that

Plaintiff would not be placed on a PIP at that time and that Thomascik would continue to meet with and coach Plaintiff regarding her performance and leadership skills. (Doc. No. 21-1 at 284, ¶ 9; Doc. No. 21-2 at 291-92; Doc. No. 17-2 at 233, ¶ 14.) On October 20, 2020, Thomascik sent Plaintiff an email following up on the previous week's meeting and discussing leadership training programs. (Doc. No. 22 at 365-67.) In response, Plaintiff stated that her team "has underlying racial issues that continue to be ignored" and suggested "[t]he team in its entirety needs to be interviewed on this matter[]." (*Id.* at 362-65.)

According to Defendant, Plaintiff "also began to exhibit productivity issues in 2020" and continuing into 2021. (Doc. No. 17 at 129-32; Doc. No. 17-2 at 233, ¶¶ 11, 15; Doc No. 17-3 at 238, ¶ 6.) Specifically, Plaintiff failed "to timely submit employee audits or outright failing to submit them at all." (Doc. No. 17 at 130.) Because the timely submission of audit reports "was the most important function of Plaintiff's position," Thomascik and Plaintiff discussed performance issues during their weekly meetings. (*Id.*; *see also* Doc. No. 17-2 at 233, ¶ 11.)

In March 2021, Thomascik approached Plaintiff about her failure to submit audit reports for January and February 2021. (Doc. No. 17 at 131; Doc. No. 17-2 at 233, ¶¶ 15-16; Doc. No. 17-1 at 226.) Thomascik further informed Plaintiff that if the audit reports were not sent, "we will be discussing an improvement plan to ensure these are completed monthly." (Doc. No. 17-1 at 226.) According to Plaintiff, she timely submitted these reports, but in a different format than Thomascik requested. (Doc. No. 21-1 at 284, ¶ 10; *see also* Doc. No. 17-1 at 224.)

Also in March 2021, Thomascik discussed placing Plaintiff on a PIP with Pishnery and Haymon starting "sometime in April or May of 2021." (Doc. No. 17-2 at 234, ¶ 17.) Pishnery, Haymon and Thomascik "discussed [] and ultimately approved the plan in April or May of 2021." (*Id.*; Doc. No. 17-3 at 238, ¶ 7.) On April 13, 2021, Plaintiff received her 2020

performance review, which identified her as an effective contributor for both her job specific competencies and performance expectations.  (Doc. No. 22 at 326.)

In April 2021, Plaintiff, who suffers from "various medical conditions, including deep venous thrombosis, as well as uterine bleeding," was injured while moving office furniture. (Doc. No. 21-1 at 284, ¶¶ 11-12.)  Consequently, Plaintiff was hospitalized from April 19 to April 25, 2021, and again from April 28 to May 11, 2021.  (*Id.* ¶¶ 12, 13; Doc. No. 22 at 332.) Between April 2021 and October 2021, Plaintiff sought and was granted  intermittent FMLA leave.  (Doc. No. 21-1 at 284, ¶ 12.)

On May 28, 2021, Thomascik met with Plaintiff and provided her with a PIP.  (Doc. No. 17-2 at 234, ¶ 18; *see also* Doc. No. 17-1 at 227-29.)  The PIP identified two areas for improvement: (1) leadership requirements and (2) operational concerns.  (Doc. No. 17-1 at 227-29.)  For leadership requirements, the PIP listed the following expectations in relevant part:

> The expectation is that you will have a set start time and a set work location schedule (schedule may change based upon business need).  Any changes to start time or use of flex-time needs to be pre-approved by leadership.

> You will provide timely responses to Manager/Director communications via email/jabber.  The expectation is that responses should be within 2 hours or the same business day as applicable.

(*Id.* at 227.)  For operational concerns, the PIP listed these expectations:

> Daily Focus Reports will be completed each day and sent to staff no later than 9am. Reports will follow the documented Standard Operating Procedure that was given on 5/12/2021.

> Staff Productivity Reports will be completed and sent out to staff and leadership bi-weekly by Wednesday at 5pm.  These reports will take into consideration the staff exception time to show true productivity in accordance to the RCM Productivity and Quality Policy.  These reports will be uploaded onto the Revenue Integrity SharePoint site for further tracking/reporting.

> Staff Quality Reviews will be completed and sent out to staff by the 8th of each month to review previous month accounts as selected via the Quadax randomized sample report.  These reports will be uploaded onto the Revenue Integrity

> SharePoint site for further tracking/reporting.  Reports will be reviewed with staff monthly to ensure real time feedback.  Quality scores will be calculated as average by quarter as documented in the RCM Productivity and Quality Policy.

(*Id.* at 228.)  The PIP set a sixty-day period of time to show improvement in these two areas.

(*Id.*)  Plaintiff was also required to meet with Thomascik regularly to discuss her performance and strategies for improvement.  (*Id.*)

Within weeks of being placed on the PIP, Plaintiff's medical conditions worsened.  (Doc. No. 21-1 at 285, ¶ 16.)  Plaintiff went on medical leave from June 10 to June 22, 2021.  (*Id.*)  As provided by the PIP, Plaintiff met with Thomascik on June 25, 2021, and July 2, 2021.  (Doc. No. 22 at 391-93, 394-98.)  At these meetings, Thomascik and Plaintiff discussed Plaintiff's progress towards meeting the PIP's goals.  (Doc. No. 17-2 at 234-35, ¶ 19.)  According to Thomascik, Plaintiff "became increasingly aggressive towards [Thomascik] during the PIP process."  (*Id.* at 234, ¶ 18.)  Thomascik testified that during one of their meetings, Plaintiff threw a notepad towards her and slammed her office door.  (*Id.*; Doc. No. 21-2 at 294.)  Plaintiff also likened her treatment throughout the PIP process to the death of George Floyd.  (Doc. No. 17-2 at 234, ¶ 18.)

According to Thomascik, "Plaintiff's performance issues continued and she was unable to satisfy many areas of the PIP."  (*Id.* at 235, ¶ 20; *see also* Doc. No. 22 at 436-37 (discussing PIP goals and progress).)  To Plaintiff, when she met with Thomascik on July 2, 2021, "despite having been on the PIP for just over 30 days and missing nearly half that time for medical reasons," Plaintiff "had already met several of the alleged 'goals' set forth in the PIP."  (Doc. No. 21-1 at 285, ¶ 18; *see also* Doc. No. 22 at 394-98.)

On July 7, 2021, Plaintiff reported discriminatory bias regarding discipline to Haymon, as well as UHHS President Cliff Mergerian.  (Doc. No. 22 at 402-04.)  On the same day, a Human Resources ("HR") representative responded to Plaintiff, informing her that Amy Wing, the

Director of HR, was assigned to investigate Plaintiff's complaint.  (*Id.* at 409-10.)  Also on July 7, 2021, Kathy LeBrew, the Vice President of Revenue Cycle reached out to Wing directly.  (*Id.* at 409.)  LeBrew informed Wing that she had "met with Kelly Thomascik [sic]" and "assured [Thomascik] that you and the H/R team would intervene to review the documentation on file and course of action as a result of [Plaintiff's] performance and bad behaviors."  (*Id.*)

According to Plaintiff, no one, including Wing, followed up with her regarding her complaint.  (Doc. No. 21-1 at 285, ¶ 20.)  Wing stated she reviewed Plaintiff's complaint but could not recall any responsive actions or any documentation of her investigative process.  (Doc. No. 21-5 at 311-13.)  The record reflects that on July 2, 2021, Haymon contacted Defendant's FMLA administrator, Reed Group, inquiring whether Plaintiff's absences on certain days were approved for FMLA leave.  (Doc. No. 22 at 419-20.)  Wing was copied on this email.  (*Id.*)  On July 15, 2021, Wing contacted Reed Group to inquire about the status of Plaintiff's FMLA leave.  (*Id.* at 417.)  In this email, Wing stated that "[i]t seems that we are giving her so much time to get paperwork in" and that "[Plaintiff] has been missing a lot of work and technically none of this is approved, although we are operating as if it is for now."  (*Id.*)

Following Plaintiff's July 2021 complaint, Defendant relocated Thomascik's office and installed a "panic button" on her new desk.  (Doc. No. 21-2 at 294-96.)  Thomascik also altered her work schedule and met with Plaintiff virtually for the remainder of Plaintiff's employment.  (Doc. No. 17-2 at 234, ¶ 18.)

On July 13, 2021, Plaintiff underwent an additional medical procedure.  (Doc. No. 21-1 at 285-86, ¶ 21.)  Plaintiff went on FMLA leave from July 13, 2021, to August 24, 2021.  (*Id.*)  Plaintiff also sought to take intermittent FMLA leave for various dates from June to November 2021.  (*Id.*)  On August 9, 2021, Plaintiff provided Defendant a return to work note for August

30, 2021.  (Doc. No. 22 at 340, 423.)  When Plaintiff provided this note to UHHS, she also

informed Wing that she would be "applying for other positions."  (*Id.* at 423.)

On August 12, 2021, Pishnery reached out to Wing to discuss how to handle Plaintiff's

PIP and ask if "we [should] continue with the documented conversations and weekly

touchbases."  (*Id.*)  Wing replied that Pishnery should "continue with documented and discussed

performance issues" because "[p]erformance is separate from attendance."  (*Id.*)  Another

member of HR stated "[i]t sounds like we would give her an additional 30 days from when she

returns."  (*Id.* at 422.)  Wing agreed that Plaintiff "would still have another 30 days since we

have to review her performance while she is at work."  (*Id.*)  On August 26, 2021, Pishnery and

Thomascik discussed Plaintiff's return to work and remaining FMLA leave.  (*Id.* at 433-34.)

In mid-September, Thomascik learned from Reed Group that Plaintiff intended to take

additional FMLA leave.  (*Id.* at 444.)  On September 16, 2021, Plaintiff and Thomascik

discussed Plaintiff's productivity reports and other aspects of Plaintiff's position via email.  (*Id.*

at 446.)  On September 17, 2021, Plaintiff and Thomascik met to discuss Plaintiff's progress on

her PIP.  (Doc. No. 21-1 at 286, ¶ 22; Doc. No. 22 at 450.)  Plaintiff and Thomascik did not meet

in the latter half of September 2021 or October 2021 to discuss her progress on the PIP.  (Doc.

No. 21 at 271; Doc. No. 21-2 at 297.)

On November 8, 2021, Plaintiff was terminated.  (Doc. No. 22 at 331.)  The stated

reasons for Plaintiff's termination were:

> Failure to meet the expectations set forth in the Performance Improvement Plan
> previously provided including;
>
>> meeting established deadlines for reporting; all daily focus reports
>> including Documentation focus and Daily Account Reports are to be
>> sent by 9am;

timely response to emails; responses to emails were outside of the expected timeframe -leadership emails are to be responded to within 2 hours or same business day;

ensuring a positive team work environment; [and]

professional and constructive communication within team and other groups.

(*Id.*)

### B. Procedural History

On December 16, 2022, Plaintiff filed her complaint and asserted the following ten causes of action: (1) disability discrimination in violation of Americans with Disabilities Act ("ADA"); (2) disability discrimination in violation of R.C. § 4112.02; (3) failure to accommodate under the ADA; (4) failure to accommodate under R.C. § 4112.01; (5) race discrimination in violation of 42 US.C. § 2000e-2; (6) race discrimination in violation of R.C. § 4112.02; (7) retaliation in violation of 42 U.S.C. § 2000e-2; (8) retaliation in violation of R.C. § 4112.01; (9) unlawful interference with Family Medical Leave Act ("FMLA") rights; and (10) retaliation in violation of the FMLA.  (Doc. No. 1.)

Defendant timely answered.  (Doc. No. 9.)  On December 1, 2023, Defendant moved for summary judgment on all causes of action.  (Doc. No. 17.)  Plaintiff opposed summary judgment only as to Counts 5 through 8, and 10.  (Doc. No. 21.)  Plaintiff did not oppose summary judgment on Counts 1 through 4 and 9.  Defendant timely replied in support of the motion. (Doc. No. 24.)

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of showing that no genuine issues of material fact exist." *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (citations and quotations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A "material" fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849-50 (6th Cir. 2020) (additional citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (quotation and citations omitted). "[O]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).

A party asserting or disputing a fact must cite evidence in the record or show that the record establishes the absence or the presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c) and (e). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.").

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the Court's role is not to make credibility determinations or "weigh" conflicting evidence.  *Payne v. Novartis Phar Corp.*, 767 F.3d 526, 530 (6th Cir. 2014); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir. 2003). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law."  *Payne*, 767 F.3d at 530.

### III.   COUNTS TO WHICH PLAINTIFF OPPOSES SUMMARY JUDGMENT

As referenced above, Plaintiff has opposed summary judgment only on five of the ten counts asserted in her complaint.  The Court will begin by addressing the counts to which she states an opposition.

#### A.      Discrimination (Counts 5 and 6)

Plaintiff alleges race discrimination pursuant to Title VII and 42 U.S.C. 2000e-2 as well as Ohio Rev. Code § 4112.01.  (Doc. No. 1, at 11-12 (Counts 5 and 6).)  Both parties agree that these claims should be analyzed together because federal case law interpreting Title VII applies to actions brought under Ohio Rev. Code § 4112.01.  (Doc. No. 17 at 144-45 (analyzing Counts 5 and 6 together); Doc. No. 21 at 279-81 (same).)  *See Birch v. Cuyahoga Cnty. Prob. Ct.*, 392 F.3d 151, 163 (6th Cir. 2004) ("[F]ederal case law applying Title VII is generally applicable to cases involving 4112 of the Ohio Civil Rights Act."); *see also Hamilton v. Sysco Food Servs. of Cleveland, Inc.*, 866 N.E.2d 559, 564 (Ohio Ct. App. 2006) (collecting cases).  The parties do not dispute that Plaintiff's claims can only be proven with circumstantial evidence.  (*See* Doc. No. 17, at 140; *see also* Doc. No. 21 at 275, 277-80.)  Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642,

652-53 (6th Cir. 2012). Discrimination claims based on circumstantial evidence must be analyzed under the *McDonnell Douglas* framework. *Upshaw v. Ford Motor Co*., 576 F.3d 576, 584 (6th Cir. 2009).

### 1. *McDonnell Douglas* Burden-Shifting Framework

Under this tripartite test, the plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). If done, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 253. Should the defendant carry that burden, the plaintiff must prove that the stated justification is pretext for discrimination. *Id.* Throughout this entire process, the burden of persuasion remains on the plaintiff to demonstrate intentional discrimination. *Id.*

### 2. The *Prima Facie* Case

The burden of establishing a *prima facie* case of discrimination "is not onerous." *Id.* The plaintiff must only demonstrate that she (a) was a member of a protected class, (b) was qualified for the position, (c) suffered an adverse employment action, and (d) was replaced by someone outside of the protected class or was treated less favorable than a similarly situated employee outside of her protected class. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).

#### a. Protected Class and Adverse Action

The parties agree that Plaintiff is a member of a protected class and that her termination was an adverse employment action. (*See* Doc. No. 17 at 144; Doc. No. 21 at 279-80.) In her

opposition brief, however, Plaintiff—for the first time in this litigation—includes the PIP as another adverse action.  (*See* Doc. No. 21 at 274.)

A plaintiff cannot "amend [her] complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint."  *Bates v. Green Farms Condominium Assoc.*, 958 F.3d 470, 484 (6th Cir. 2020).  The Federal Rules of Civil Procedure "provide for liberal notice pleading at the outset of litigation because '[t]he provisions for discovery are so flexible' that by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the Court.'"  *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).  However, "[o]nce a case has progressed to the summary judgment stage, [] 'the liberal pleading standards'" under the Federal Rules are inapplicable.  *Id.* (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp.2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).")).

To Defendant, Plaintiff did not raise the PIP as an adverse action in either her discrimination or retaliation claims and even then, it was only when she filed her brief in opposition to summary judgment.  (Doc. No. 17 at 143.)  In contrast, Defendant acknowledges that Plaintiff *did* allege the PIP in connection with her FMLA claim.  (*See* Doc. No. 17 at 143; *see also* Doc. No. 1 at 15 (Count 10).)  However, this allegation demonstrates that the PIP was well known to her at the time she filed her complaint.  *Tucker*, 407 F.3d at 789 (citing *Sherman v. Ludington*, No. 91-3936, 1992 WL 158878, at *1 (6th Cir. July 7, 1992) and *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

Discovery has long since concluded.  Plaintiff could have sought to amend her complaint, but she did not.  Asserting new theories in an opposition brief impermissibly amends the complaint.  *Bates*, 958 F.3d at 484.  Such an "amendment" at this stage of the litigation would subject UHHS to unfair surprise without any meaningful opportunity to conduct discovery specific to the newly asserted theory or fully address it in their summary judgment briefing.  *Tucker*, 407 F.3d at 788; *see also Henderson v. Chrysler Grp.*, 610 Fed. App'x 488, 494 (6th Cir. 2015) (holding that a plaintiff waived an argument "because her complaint did not provide [the defendant] with sufficient notice that her retaliation claim was based in, in part" on protected activity not alleged in the complaint).  As such, the Court will consider the arguments as pleaded.  Termination was pleaded as an adverse in Plaintiff's discrimination, retaliation, and FMLA claims.  The PIP was pleaded as an adverse action only as to Plaintiff's FMLA claim.  Because the parties do not dispute that termination is an adverse employment action, this element is met.

### b.  Qualifications

To establish her qualifications for the position at this stage, Plaintiff must demonstrate that she satisfied the employer's "objective" qualifications.  *Upshaw*, 576 F.3d at 58.  This inquiry recognizes that "specific qualifications will vary depending on the job in question," but should focus on "education, experience in the relevant industry, and demonstrated possession of required skills.  *Wexler v. White's Fine Furniture, Inc*. 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc).

In its motion, UHHS states that Bates was not qualified because her performance deteriorated, and she failed to meet the requirements of the PIP.  (Doc. No. 17 at 141-42.)  Plaintiff responds that challenges to qualifications cannot be premised on performance because doing so conflates the distinct stages of the *McDonnel Douglas* test.  (Doc. No. 21 at 279-80.)

The Sixth Circuit once considered whether a plaintiff was performing to the employer's satisfaction at the *prima facie* stage.  *See Dews v. A.B. Dick Co*., 231 F.3d 1016, 1022 (6th Cir. 2000); *see also Strickland v. Federal Express Corp.*, 45 Fed. App'x 421,424 (6th Cir. 2002).  But that changed in 2003 when the Sixth Circuit issued its *en banc* decision in *Wexler*.  There, the Sixth Circuit held that "[a]t the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether [] she was qualified for the relevant job" rather than focus on her performance."  317 F.3d at 575; *see also Cicero v. Borg-Warner Auto., Inc*., 280 F.3d 579, 587-88 (6th Cir. 2002) ("Under the *McDonnell Douglas* test, concerns about [a plaintiff's] performance are more appropriately raised as part of the second and third steps . . .") (internal quotations omitted).

UHHS's challenge hinges on performance, not Bates' objective qualifications.  In her opposition brief, Bates asserts that she met the objective qualifications for the job since being hired by UHHS in October 2018.  (Doc. No. 21 at 280.)  In reply, UHHS abandons its argument that Bates has not met this element of the *prima facie* case because of Bates' performance concerns.  (*See* Doc. No. 24.)  For these reasons, the Court finds that Plaintiff has demonstrated her objective qualifications for the position and satisfied this element of her *prima facie* case.

### c. Less Favorable Treatment

In the fourth and final consideration in the *prima facie* analysis requires Plaintiff to demonstrate that she was replaced by someone outside of her protected class *or* was treated less favorably than a similarly situated employee outside of her protected class.  *Briggs*, 11 F.4th at 508.  Plaintiff does not dispute that she was replaced by another African American employee.  (Doc. No. 21 at 280.)  Instead, she points to two Caucasian employees, Thomascik and Djukic to show her treatment by UHHS was less favorable.  (*Id.* at 280-81.)

Employees are considered similarly situated if a plaintiff can prove that "all of the relevant aspects of [the] employment situation are nearly identical to those of the employees who [she] alleges were treated more favorably." *Campbell v. Hamilton Cnty.*, 23 Fed. App'x 318, 325 (6th Cir. 2001); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (a plaintiff must "demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects") (emphasis in original).

> [T]o be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Johnson v. Ohio Dept. of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) ("Although other factors may also be relevant depending on the facts of each case, *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019), the *Mitchell* factors are generally relevant.").

*Supervisors*.  Pishnery supervised Thomascik.  (Doc. No. 17 at 130.)  Thomascik supervised Plaintiff (*id.* at 128), and Plaintiff, in turn, supervised Djukic. (*Id.* at 129.)  Plaintiff's "supervisor in common theory" is not sufficient to establish that she, Thomascik and Djukic are similarly situated in this way.  (*See* Doc. No. 21 at 280-81.)  Instead, the employees must share the same direct supervisor.  *See Johnson*, 942 F.3 at 332 (finding two officers were not similarly situated in part because they had different *direct* supervisors even though the same director ratified disciplinary measures); *see also Morton v. Greater Cleveland Reg'l Transit Auth.*, No. 1:21-cv-01986, 2023 WL 11796396, at *6 (N.D. Ohio July 14, 2023) ("[T]he question is not whether Morton and Rivera shared supervisors somewhere up the chain of command, but whether they had the same 'direct supervisors.'") (citing *Johnson*, 942 F.3 at 332).  Here, the

undisputed evidence shows that Plaintiff, Thomascik, and Djukic each had different direct supervisors and are therefore not similarly situated in this respect.

*Standards*.  In addition to having different direct supervisors, all three employees held different positions at UHHS.  Plaintiff was a Revenue Cycle Supervisor (Doc. No. 21-1 at 283, ¶ 1), Thomascik was a Corporate Billing Manager (Doc. No. 17-2, at 231, ¶ 3), and Djukic was a Biller 2 (Doc. No. 21 at 261).  That each held a different position is also not disputed.  (Doc. No. 21 at 280 (arguing "even though both employees held different job positions than Bates, that does not defeat the test").)  There is no evidence on the record establishing "that such different positions, or the duties and responsibilities required of the holders of these jobs, are sufficiently similar so as to render them 'comparable' positions."  *Mitchell*, 964 F.3d at 583 n. 5.  Construing the inferences to be drawn from these facts in Plaintiff's favor, as the Court must when considering a Rule 56 motion, the only reasonable inference is that the standards applicable to each employee differed.

*Conduct*.  "In the disciplinary context, [the Sixth Circuit has] held that to be found similarly situated, the plaintiff and [her] proposed comparator must have engaged in acts of '*comparable seriousness*.'"  *Wright v. Murray Guard, Inc*. 455 F.3d 702, 710 (6th Cir. 2006) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (applying the *Ercegovich* approach to a Title VII claim) (quoting *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).  Thus, Plaintiff must prove that she and the white employees she identified engaged in acts of comparable seriousness to her own.

Plaintiff argues that Thomascik "overrode Bates' decision-making ability" by not allowing her to "discipline Djukic or otherwise manage her in the same way [Bates] managed other employees."  (Doc. No. 21 at 280.)  By doing this, Thomascik acted as Djukic's direct

supervisor, something Thomascik did not do with respect to Shotwell, an African American employee also under Plaintiff's supervision.  (*See id.*)  The email exchanges between Djukic and Shotwell are summarized in Plaintiff's factual summary.  (*See also id.* at 262.)

This argument fails for several reasons.  First, Plaintiff has not introduced evidence that she was treated differently than other Revenue Cycle Supervisors, let alone that those supervisors' management or disciplinary decisions were not evaluated by Thomascik.  Second, Plaintiff's argument involves Thomascik's decision that neither Djukic (a Caucasian employee) nor Shotwell (an African American employee) would be disciplined for their heated email exchange.  (*See id.*; *see also* Doc. No. 22 at 407; Doc. No. 17-1 at 218.)  To Plaintiff, Thomascik treated these two employees differently by preventing Djukic from being disciplined while also characterizing Shotwell's email responses as "not great."[2]  (Doc. No. 21 at 262.)  But Thomascik's response demonstrates that these employees were treated the same: neither were disciplined.  Third, this incident and Thomascik's response do not provide any evidence that Plaintiff and Thomascik engaged in acts of comparable seriousness for which Plaintiff alone was disciplined.

For these reasons, Plaintiff has not met her burden of demonstrating a *prima facie* case, but, even if she could, her claim must be summarily dismissed for the reasons set forth below.

### 3.    Legitimate, Nondiscriminatory Reason

UHHS's burden at this stage is simply to "clearly set forth, through the introduction of admissible evidence, the reasons" for the adverse action.  *Burdine*, 450 U.S. at 255.  This burden does not require that the employer "persuade the Court that it was actually motivated by the proffered reasons[.]"  *Campbell v. Norfolk S. Corp.*, 876 F. Supp. 2d 967, 982 (N.D. Ohio 2012)

---

[2] Other than this comment, Plaintiff presents no evidence that Shotwell was either disciplined or faced any negative employment consequences for her role in this email exchange.

(citing *Burdine*, 450 U.S. at 254.).  Rather, the burden is satisfied if UHHS "'explains what [it] has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'"  *Burdine*, 450 U.S. at 256 (quoting *Board of Trustees of Keene St. College v. Sweeney*, 439 U.S. 24, 25, n.2 (1978)).  Simply stated, UHHS "need not prove a nondiscriminatory reason for [its decision] but need merely to articulate a valid rationale."  *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

UHHS states that Plaintiff's poor performance led to her termination.  (Doc. No. 17 at 142.)  In support, UHHS cites testimony from Plaintiff, Thomascik and Pishnery that Bates did not satisfy the conditions of her PIP.  (*See id.* at 136; *see also* Doc. No. 17-1 at 230 (discussing expectations in the PIP that were not met).)  UHHS further argues that under Sixth Circuit precedent, "performance issues and failing to satisfy the PIP" constitute "non-discriminatory reason[s] for an adverse action."  (*Id.* at 142 (citing *Bacon v. Honda of Am. Mfg., Inc.*, 192 Fed. App'x 337, 344-45 (6th Cir. 2006) and *Becker v. Elmwood Local Sch. Dist.*, 519 Fed. App'x 339, 343 (6th Cir. 2013)).)  For her part, Plaintiff does not dispute that she failed to satisfy several requirements of the PIP.  (*See* Doc. No. 17-1 at 165-68;[3] *see also* Doc. No. 21 at 275 (noting that Bates satisfied "several aspects" but not the entirety of the PIP).)  As such, UHHS has sufficiently stated a nondiscriminatory reason for terminating Plaintiff.

### 4. Pretext

To prove pretext, the plaintiff may show that the employer's reason for the adverse action either: (a) has no basis in fact, (b) did not actually motivate the employer's actions, or (c) was an insufficient motivator for the employer's actions.  *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946

---

[3] In her deposition, Plaintiff made several concessions, including that the expectation that she would have a set work schedule "did not work out" (Doc. No. 17-1 at 166); that there was "no way" she could respond to emails within two hours as outlined in the PIP (*id.*); and that she completed the Daily Focus Reports in timely manner "[f]or the most part" but there was "no possible way" for her to do so every day (*id.* at 167; *see also id.* at 169 (stating "[t]here were times where there was justification" for missing deadlines).)

F.3d 883, 888 (6th Cir. 2020).  "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her.'"  *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen v. Down Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)) (bracketed language omitted).

In an effort to satisfy her burden at this stage, Plaintiff argues that "Thomascik, the central figure involved in the race discrimination allegations by Bates [e.g., the treatment of Djukic and Shotwell] was also the 'same actor' who terminated Bates employment."  (Doc. No. 21 at 281.)  Again, Shotwell was not disciplined, and neither was Djukic.  And even if Shotwell were disciplined while Djukic was not, Plaintiff has not shown how this would be sufficient evidence to refute that *her* termination was because *she* underperformed in the position.  Instead, the undisputed facts are: Plaintiff was failing to meet critical components of her employment; she was placed on a PIP in an effort to improve her performance; she failed to meet all requirements of the PIP; and the failure to do so is a legitimate basis for termination.  Thus, Plaintiff's opposition does not, as it must, provide any evidence to support that UHHS's stated reason for termination was false, not causally connected, or was an insufficient reason to terminate her.

For these reasons, Plaintiff's discrimination claims (Counts 5 and 6) are dismissed.

### B.      Retaliation (Counts 7 and 8)

UHHS moved for summary judgment on Plaintiff's retaliation claims.  (Doc. No. 17 at 143-44.)  Again, both parties agree that these claims should be analyzed together under the *McDonnell Douglas* burden shifting framework.  (*Id.* at 140, 144; Doc. No. 21 at 277.)  *See also Allman v. Walmart, Inc.*, 967 F.3d 566, 571 (6th Cir. 2020) ("[R]etaliation claims under Ohio law are analyzed the same way as under federal law.");  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir.

2013)) (holding that like discrimination claims, retaliation claims premised on circumstantial evidence are subject to the *McDonnell Douglas* framework).

To establish a *prima facie* case of retaliation, a plaintiff must produce evidence showing that (a) she engaged in protected activity; (b) the employer was aware of the protected activity; (c) the employer took an action that was materially adverse to the employee; and (d) there is a causal connection between the employee's protected activity and the employer's adverse action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021).

Employers are prohibited from discriminating against any employee "because he [or she] has opposed any practice made unlawful by this title." *Id.* at 343 (quoting 42 U.S.C. § 2000e-3(a)) (alterations omitted).  To "oppose" means "to resist or antagonize; to contend against to confront; resist; withstand."  *Id.* at 344 (quoting *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009)) (alterations omitted).  Protected activities include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; [and] refusing to obey and order because the worker thinks it is unlawful under Title VII."  *Id.* at 344-45 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)).  The employee's complaint need not be "lodged with absolute formality, clarity, or precision" but does need to go beyond a "vague charge of discrimination."  *Id.* at 345 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)).  In sum, an employee "must allege facts that she opposed unlawful [employer] practices in a reasonable manner and with a reasonable and good faith belief" that those practices violated the law.  *Id.* at 346.

Inferences to be drawn from the underlying facts must be drawn in Plaintiff's favor.  As such, the Court finds that the first two elements of the *prima facie* case (that Plaintiff engaged in

protected activity and that UHHS was aware of this protected activity) are met.  The third element, that being her termination was an adverse action, is not in dispute.  Thus, the Court evaluates whether Bates can show the requisite causal connection.

"[A] plaintiff making a retaliation claim under Title VII must establish [] her protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  Here, Bates must demonstrate that but for her raising concerns about race discrimination, she would not have been terminated.  There is no dispute that Bates expressed concern that employees were being treated differently because of their race.[4]  But also undisputed is Bates' failure to submit required audit reports, a critical function of her job.  (Doc. No. 17 at 130; *see* Doc. No. 17-2 at 233, ¶ 11; *see also* Doc. No. 17-1 at 214 (describing "conducting routine staff audits for productivity and tracking results" as 20% of a Revenue Cycle Supervisor's duties).)  Further, as discussed above, Bates conceded in her deposition that she did not satisfy the requirements of the PIP.  (*See* Doc. No. 17-1 at 165-68.)  Bates likewise conceded that a PIP is a tool to address an employee who needs to improve his or her performance and that failure to meet the requirements of a PIP is a legitimate basis for discharge.  (*See id.* at 156, 169).  Given these admissions, Plaintiff cannot demonstrate that her communications about discriminatory practices were the but-for cause of her termination.

---

[4] The factual dispute appears to be (a) how many times Bates expressed concerns, and (b) when the concerns were raised.  (*Compare* Doc. No. 17 at 143 (asserting Bates' October 2020 Complaint was not protected activity) *with* Doc. No. 21 at 273 (arguing Bates engaged in protective activity multiple times, including October 2020).)  For purposes of evaluating causation in this instance, these disputed facts are not material.  Drawing all inferences in Plaintiff's favor, these factual disputes do not alter the causation analysis given Bates' admissions, the PIP opportunity, and ultimate termination after her job performance did not improve.

Even assuming Plaintiff could establish her *prima facie* case, UHHS stated a legitimate, non-discriminatory reason for discharge.  With the burden then shifting to Plaintiff, for the reasons stated above—her concessions as to performance and the failure to satisfy the PIP's stated requirements—she cannot establish, and no jury could conclude, that UHHS's stated reasons for discharge were pretextual.  For these reasons, Plaintiff's retaliation claims (Counts 7 and 8) are dismissed.

C.  **FMLA Retaliation (Count 10)**

To establish FMLA retaliation, Bates must show that "[s]he engaged in FMLA protected activity, [UHHS] knew that [s]he was exercising [her] FMLA rights, [UHHS] subsequently took an adverse employment action against [her], and there was a causal connection between the protected activity and the adverse action."  *Render v. FCA U.S. LLC*, 53 F.4th 905, 920 (6th Cir. 2022) (quoting *Redlin*, 921 F.3d at 616).  This claim is also assessed under the *McDonnell Douglas* burden-shifting framework.  *Skrjanc v. Great Lakes Power Serv. Co*., 272 F.3d 309, 315 (6th Cir. 2001).

1.  **The *Prima Facie* Case**

There is no dispute about the first three elements of the *prima facie* case:  Bates engaged in protected activity by taking her leave, UHHS was aware Plaintiff invoked her FMLA rights, and she suffered an adverse employment action (the PIP and termination). [5]

---

[5] On reply, UHHS asserts for the first time that Plaintiff's FMLA retaliation claim fails because she was "not an 'eligible employee' at the time of discharge."  (Doc. No. 24 at 462.)  Defendant claims that Plaintiff was not an eligible employee because she had already exhausted her FMLA leave.  (*Id.*)  The cases Defendant cites do not support this definition of "eligible employee" and instead address FMLA retaliation claims brought by employees who did not qualify for FMLA protection, rather than employees who exhausted their FMLA leave at the time of termination. (*See id.* (citing *Humenny v. Genex Corp., Inc.*, 390 F.3d 901, 905 (6th Cir. 2005); *Coen v. Sybron Dental Specialties*, 1 Fed. App'x 386, 389 (6th Cir. 2001); and *Davis v. Michigan Bell Tel. Co.*, 543 F.3d 345, 354 (6th Cir. 2008)).)  Moreover, "it is well-established that a party cannot raise

The disputed element of the *prima facie* case is causation.  To satisfy the causation element at this stage in the burden-shifting framework, "the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken adverse action against the plaintiff had the plaintiff not engaged in the protected activity[.]" *Abbott v. Crown Motor Co*., 348 F.3d 537, 543 (6th Cir. 2003).

Temporal proximity is relevant when assessing causation.  *See Stein v. Atlas Indus., Inc.*, 730 Fed. App'x 313, 319 (6th Cir. 2018) (discussing when temporal proximity establishes causation); *see also Ritenour v. Tenn. Dep't of Hum. Servs.*, 497 Fed. App'x 521, 533 n. 10 (6th Cir. 2012) (discussing Sixth Circuit law on temporal proximity as evidence of causation).  As such, the relevant time period begins when "an employer learns of a protected activity" and extends to the adverse action.  *Bush v. Compass Grp. USA, Inc.*, 683 Fed. App'x 440, 452 (6th Cir. 2017).

Plaintiff focuses on the following timeline: Plaintiff informed Thomascik that she needed to take FMLA leave on or around April 19, 2021.  (Doc. No. 21-1 at 284, ¶ 12)  On May 28, 2021, Plaintiff was placed on a PIP.  (*Id.* at 285, ¶ 14.)  Turning to Plaintiff's termination, Thomascik and Pishnery became aware that Plaintiff intended to seek additional FMLA leave in mid-September 2021.  (Doc. No. 21 at 271 (citing Doc. No. 22 at 444-45); *see also* Doc. No. 22 at 446.)  Less than two months later, Plaintiff was terminated.  (Doc. No. 17-1 at 230.)

What Plaintiff does not address, however, is that Thomascik first considered placing Bates on a PIP *six months before* Bates' first FMLA leave.  Bates also does not dispute she was informed that her deficient performance would result in a PIP *one month before* she first took

---

new issues in a reply brief; he can only respond to arguments raised for the first time in the opposition."  *In re FirstEnergy Corp. Sec. Litig.*, 316 F.Supp.3 581, 599 (N.D. Ohio 2004) (citing *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002)).

FMLA leave.  (Doc. No. 17-2, 233-34, ¶¶ 14, 16; Doc. No. 17-3 at 238, ¶¶ 5, 7; Doc. No. 21-2 at 291.)

The official decision to place Bates on a PIP was made in April or early May 2021, with Thomascik circulating a draft PIP on May 19, 2021, (Doc. No. 22 at 298; Doc. No. 21-2 at 292) and implementing the PIP on May 28, 2021.  (Doc. No. 21-1 at 285.)  While Bates suggests that she should not have been placed on the PIP at all, she does not refute that Thomascik both considered a PIP and notified Bates of the possibility of a PIP prior to her FMLA leave.  The fact that Thomascik, Pishnery, and Haymon moved forward with the plan to place Bates on a PIP either the same month, or shortly after Plaintiff took FMLA leave does not establish a causal connection between the PIP and Plaintiff's protected activity.  *See Reynolds v. Extendicare Health Servs., Inc.*, 257 Fed. App'x 914, 919-20 (6th Cir. 2007) (holding that consistent with *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), "it is not appropriate to view placing [an employee] on [a] PIP as being causally related [] because the PIP decision had been made prior to the protected action"); *see also Muhammad-Smith v. Psychiatric Sols. Inc.*, 877 F.Supp. 3d 552, 558 (N.D. Ohio 2012) (applying the Sixth Circuit's logic in *Reynolds* to an FMLA retaliation claim).

As for termination, Plaintiff took FMLA-authorized absences during the PIP period.  (Doc. No. 21-1 at 285, ¶¶ 16-18, 21.)  Plaintiff was terminated after using continuous and intermittent FMLA leave.  (*Id.* at 286, ¶ 22.)  Thus, while there is no causal connection between the PIP and Plaintiff's use of FMLA time, Plaintiff's termination after using FMLA leave is sufficient to demonstrate a causal connection sufficient to support the low threshold of demonstrating her *prima facie* case.

### 2.      Legitimate, Non-Discriminatory Reason for the Adverse Action

Again, Defendant has stated a legitimate, non-discriminatory reason for termination: Plaintiff's deficient performance and her acknowledged failure to meet the PIP's requirements.

### 3.      Pretext

Again, it is Bates' burden to show that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Dews*, 231 F.3d at 1021).

In arguing that her failure to complete the PIP's requirements was insufficient to warrant termination, Plaintiff asserts—without authority—that an employee's progress on some elements of a PIP is sufficient to show that later termination was pretextual.  (*See* Doc. No. 21 at 276-77.) But Plaintiff has failed to submit evidence, as she must, that the acknowledged performance deficiencies did not, on their own, warrant discharge.  Instead, she testified that her failure to perform all of the requirements of the PIP was a legitimate basis for termination.  (Doc. No. 17-1 at 169 (acknowledging that an employee who failed to meet a performance improvement plan would be subject to discharge)).

Plaintiff also argues that Defendant intended to "progress her through the PIP and then terminate her employment accordingly."  (Doc. No. 21 at 279.)  But this argument is belied by the record.  When Plaintiff returned to work in late August 2021, members of the Human Resource Department and Thomascik extended her PIP period by thirty additional days to account for Plaintiff's approved leave time.  (Doc. No. 22 at 422.)  The record reflects that the PIP period was extended even further to allow Bates over sixty days *after* returning from FMLA leave to complete the PIP.  (Doc. No. 17-2 at 235-36, ¶ 23.)  All told, Plaintiff spent over five

months on a PIP before she was terminated.  (*See* Doc. No. 22 at 331; Doc. No. 17-2 at 234, ¶¶ 18, 20; Doc. No. 21-1 at 285, ¶ 14, 286, ¶ 22.)  Plaintiff concedes that she did not meet several PIP requirements, and her failure to do so was grounds for UHHS to terminate her employment. (Doc. No. 17-1 at 166, 167, 168-69.)  For these reasons, Plaintiff cannot demonstrate that UHHS' stated reason for termination was pretextual and this claim is dismissed as a matter of law.

## VI. COUNTS TO WHICH PLAINTIFF HAS STATED NO OPPOSITION TO SUMMARY JUDGMENT

### A. Legal Standard

The party moving for summary judgment "always bears the burden of demonstrating the absence of a genuine issue as to material facts."  *Carver v. Bunch*, 946 F.2d 451, 454-55 (6th Cir. 1991) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  This burden applies "regardless if an adverse party fails to respond."  *Id.*  A district court "cannot grant summary judgment in favor of a movant simply because the adverse party has not responded."  *Id.* Instead, "[t]he court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden."  *Id.*; *see also Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 Fed. App'x 374, 381 (6th Cir. 2011) (holding a movant was not entitled to summary judgment simply because the other party failed to respond); Advisory Committee Note on 1963 Amendment to Subdivision (e) of Fed. R. Civ. P. 56 (explaining that the amendment was not "designed to affect the ordinary standards applicable to the summary judgment motion," and that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented").

B.    **Disability Discrimination (Counts 1 and 2)**

Title I of the ADA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a). In order to establish a *prima facie* case of disability discrimination, Plaintiff must demonstrate that she is (1) disabled; (2) otherwise qualified for the position and sought; and (3) excluded from the position under circumstances that raise a reasonable inference of unlawful discrimination.  *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 441 (6th Cir. 1991).

In her complaint, Bates alleged that her deep vein thrombosis, anemia, and hypertension constitute disabilities and that UHHS "perceived Bates as being disabled based on the conditions she suffered from."  (Doc. No. 1 at 7, ¶¶ 73-75.)  UHHS moved for summary judgment arguing, among other things, that Bates was not disabled because her conditions were temporary, and she was "cleared to return to work without restriction in August 2021."  (Doc. No. 17 at 141.)

A "disability" is a (1) a physical or mental impairment that substantially limits one or more of the major life activities of the employee; (2) a record of such an impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(2).  "Short-term temporary restrictions on major life activities are generally not disabilities under the ADA."  *Hein v. All American Plywood Co., Inc.*, 232 F.3d 482, 487 (6th Cir. 2000); *see also Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir. 1996) (holding that plaintiff's temporary kidney condition was not a disability under the ADA).

Ohio law similarly defines disability as a "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."  R.C. § 4112.01(A)(13); *see also Bare v. Federal Exp. Corp.*, 886 F.Supp.2d 600, 609 (N.D. Ohio 2012).  When considering whether a plaintiff has established a disability, Ohio courts have held that impairments that are "minor and of short duration" or "transitory and minor" are insufficient.  *Long v. KeltanBW, Inc.*, -- N.E. 3d --, 2024 WL 3064540, at *5 (Ohio 8th Dist. June 20, 2024); *see also Thomas v. PNC Bank N.A.*, 2018-Ohio-4000, 2018 WL707882, at *3 (Ohio 8th Dist. Sept. 27, 2018).

Bates returned to work without limitation in August 2021 after taking all requested (and approved) FMLA leave.  (Doc. No. 17-1 at 163.)  There is no evidence that Bates' conditions interfered with any of her life activities after being cleared to work without restriction.  As such, Bates is not disabled for purposes of maintaining a disability discrimination claim, and these counts are dismissed as a matter of law. [6]

### C.     Failure to Accommodate (Counts 3 and 4)

To establish a *prima facie* case of disability discrimination for failure to accommodate, a plaintiff must show that:

> (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Myers v. Cuyahoga Cnty.*, 182 Fed. App'x 510, 515 (6th Cir. 2006).

UHHS argues that these claims fail for the same reason her disability discrimination claim fails.  First, Bates was not disabled.  Second, "the only accommodation [Plaintiff]

---

[6] *See Siefert v. Liberty Twp.*, No. 4:22-cv-1453, 2023 WL 4904036, at *4 (N.D. Ohio July 31, 2023) ("Under the *McDonnell Douglas* framework, Plaintiff must first establish *all* elements of his *prima facie* case.") (emphasis added); *Long*, 2024 WL 3064540 at *3 ("A failure to establish all of the elements of a prima facie case is fatal to a disability discrimination claim.").

requested was leave for her April 2021 injury and that Defendant granted all requested leave." (Doc. No. 17 at 138.)  As stated above, Bates' conditions were temporary and insufficient to demonstrate any persistent interference with any major life activity.  Indeed, she was cleared to work without restriction.  Moreover, there is also no evidence that Bates was denied a requested accommodation.

Thus, Plaintiff's failure to accommodate claims are dismissed as a matter of law.

### D.  Interference with FMLA Rights (Count 9)

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).

To succeed on a FMLA interference claim, a plaintiff must demonstrate that:

(1) he [or she] was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his [or her] intention to take leave; and (5) the employer denied the employee FMLA benefits to which he [or she] was entitled.

*Id.* For FMLA interference claims—which are also sometimes referred to as entitlement claims—"the issue is simply whether the employer provided its employees the entitlements set forth in the FMLA." *Id.* (quoting *Arban*, 345 F.3d at 401).

UHHS does not contest that Plaintiff has proven the first four elements of her FMLA interference claim.  Instead, UHHS highlights that it granted all of Bates' requested FMLA leave. (Doc. No. 17 at 145.)  Bates did not oppose UHHS' motion for summary judgment with respect to this claim.

The record reflects that UHHS did not deny Plaintiff any FMLA benefits to which she was entitled.  Therefore, Plaintiff's interference claim fails as a matter of law.

V.  **CONCLUSION**

For all of the reasons stated herein, Defendant University Health System, Inc.'s motion for summary judgment (Doc. No. 17) is GRANTED in its entirety.

**IT IS SO ORDERED.**

**Date:**  September 26, 2024

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE